Filed 7/21/16  Kransky v. Depuy Orthopaedics CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SHERYL R. KRANSKY, as Personal Representative, etc., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DEPUY ORTHOPAEDICS, INC., <br><br> Defendant and Appellant. | B249576 <br><br> (Los Angeles County Super. Ct. No. BC456086) |

APPEAL from a judgment of the Superior Court of Los Angeles County, J. Stephen Czuleger, Judge.  Affirmed.

O'Melveny & Myers, Charles C. Lifland, Richard B. Goetz, Cynthia A. Merrill and Jonathan P. Schneller for Defendant and Appellant.

Law Offices of Martin N. Buchanan, Martin N. Buchanan; Gomez Iagmin Trial Attorneys, John H. Gomez; Law Offices of Dean A. Goetz, Dean A. Goetz; Walkup, Melodia, Kelly & Schoenberger, Michael A. Kelly and Khaldoun A. Baghdadi; Panish, Shea & Boyle and Brian J. Panish for Plaintiff and Respondent.

_____

## INTRODUCTION

DePuy Orthopaedics, Inc. appeals from a judgment in favor of Loren Kransky after a five-week jury trial.[1]  The jury found DePuy strictly liable under Montana law for the defective design of a hip implant that doctors ultimately had to remove from Kransky's hip in a risky and painful revision surgery.  The jury awarded Kransky over $8.3 million:  $338,136.12 in economic damages for medical expenses and $8 million in noneconomic damages.  The jury did not find that DePuy acted with fraud or malice.

DePuy challenges several evidentiary rulings, including the exclusion of evidence related to the hip implant's clearance by the federal Food and Drug Administration (FDA) for sale in the United States, and the admission of certain testimony by Kransky's expert witness and his treating physician.  We conclude that the trial court did not abuse its discretion in any of its evidentiary rulings.  DePuy also argues that the jury's verdict is not supported by substantial evidence and is internally inconsistent.  We conclude that the verdict is supported by substantial evidence and is not irreconcilable.  Finally, DePuy argues that the damages award is excessive.  We conclude that the $8.3 million compensatory damages award is not so grossly out of proportion as to shock the conscience.  Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *Kransky's Hip Implant Surgery and Subsequent Revision Surgery*

Kransky had hip implant surgery in December 2007.  The implant was a device called the ASR XL, which DePuy manufactured.  The ASR XL was a "metal on metal"

---

[1]     Kransky died on February 26, 2014, while this appeal was pending.  We granted respondent's motion to substitute Kransky's surviving spouse, Sheryl R. Kransky, as the personal representative of the Estate of Loren D. Kransky, for Loren Kransky.

implant with three parts: a metal cup that is inserted into the patient's hip during the surgery, a metal ball that rotates inside the cup, and a stem that is attached to the ball.

After the surgery, Kransky experienced "a lot of pain" in his hip, as well as a clicking and popping sensation. Kransky also began to have trouble with his mobility, "fall[ing] for no apparent reason." He began to lose weight, and noticed declines in his energy level and overall health. His doctor, who found Kransky had high levels of cobalt and chromium in his blood, believed that Kransky was suffering from metal toxicity (metal ions leaking from the implant into his body) and that Kransky would die if the hip implant was not replaced. Although Kransky had many other health problems, his primary care physician believed that none of those other problems was causing Kransky's pain, loss of mobility, unexplained weight loss, and declining health.

Kransky was one of many patients who experienced problems with an ASR XL implant. As early as 2006, surgeons began to observe an unusually high rate of problems with the ASR XL. These problems included "component loosening, component malalignment, infection, fracture of the bone, dislocation, metal sensitivity and pain." Data from national registries of hip implants around the world began reflecting higher than expected rates of revision (surgery to remove and replace the implant) for the ASR XL. Australia, one of the first countries where DePuy sold the ASR XL, showed a five-year revision rate of 22 percent, as did English and Welsh registries. DePuy's other metal-on-metal hip implants on the market at the time averaged five-year revision rates of approximately 4 percent. In 2010, when the failure rates of the ASR XL implant were widely known, DePuy voluntarily recalled the implant before the FDA took any action. On the recall form DePuy filed with the FDA, DePuy checked a box to indicate that the recall was the result of a "defective product that would affect product performance and/or could cause health problems."

Although Kransky's physicians were concerned that he may not survive a revision surgery, they believed that the need to remove the implant outweighed the risks. In February 2012 an orthopedic surgeon successfully performed the revision surgery, removing the ASR XL. The surgeon found classic symptoms of metal wear from a failed

implant. A biomedical engineer analyzed Kransky's ASR XL implant and found evidence of "much more than normal" metal wear on the implant. The engineer also found black-stained tissue attached to the back of the implant's cup. The engineer concluded that the ASR XL implant was defective because of excessive rim loading (the engineering term for when the head of the implant gets too close to the rim of the cup) that released a harmful amount of metal debris. After the surgery, Kransky's pain levels decreased and his mobility improved.

B.    *The Complaint and the Motions In Limine*

Kransky filed a complaint asserting 13 causes of action against DePuy and others. By the time of trial, the only remaining claims were against DePuy for negligent design, strict liability design defect, and strict liability failure to warn. Kransky alleged that DePuy was negligent in its design of the ASR XL "by failing to exercise reasonable care in the testing, . . . designing, formulating, constructing, . . . fabricating, [and] producing" of the implant. Kransky also alleged DePuy was strictly liable for the ASR XL's defective design, which caused the device to "not perform as safely as an ordinary consumer would have expected at the time of use," and which resulted in the release of metal debris into Kransky's body, causing him pain, and requiring him to undergo a revision surgery. Kransky further alleged that DePuy was strictly liable for failing to warn that the ASR XL was dangerous and defective despite the fact that "potential risks . . . were known at the time of manufacture, distribution or sale."

Kransky filed several motions in limine. One of Kransky's motions asked the court to exclude "all references to the Food and Drug Administration (FDA)," including evidence that the FDA cleared the ASR XL for sale in the United States. Kransky argued that DePuy would mischaracterize the evidence and confuse the jury regarding the FDA's approval of the ASR XL, because the FDA had cleared the implant under an abbreviated review process provided by section 510(k) of the Food, Drug, and Cosmetic Act, rather than under the FDA's comprehensive Premarket Approval process (PMA), which is much more rigorous and focuses more specifically on the safety and efficacy of the

4

device. Kransky also argued that evidence of FDA clearance under section 510(k) had little probative value on the issue whether the implant was defective. The trial court granted the motion, finding under Evidence Code section 352 that the probative value of the FDA evidence would be substantially outweighed by the probability that explaining to the jury the differences between the abbreviated 510(k) review process and the standard PMA would consume an undue amount of time. The trial court granted the motion without prejudice to DePuy's right to raise the issue again if Kransky "opened the door" by suggesting the ASR XL was on the market illegally or that DePuy did not follow FDA procedures.

DePuy filed motions in limine to exclude opinion testimony by Kransky's primary care physician, Thomas Trotsky, that chromium and cobalt debris from Kransky's ASR XL implant was poisoning Kransky and that the implant was killing him. DePuy argued that Dr. Trotsky was not qualified to give such opinions because he was not a toxicologist. The court denied the motion, ruling that Dr. Trotsky had "sufficient qualifications to treat plaintiff and report the results of his treatment."

C. *The Trial*

To prove that the design process of the ASR XL had been inadequate and that the product was defective, Kransky called several witnesses, including the project manager in charge of developing the ASR XL implant. The project manager testified that he had never developed a hip implant before joining DePuy and he had no experience with orthopedic devices before joining DePuy. A biomedical engineer testified that DePuy's testing technique and its decisions based on premarket testing fell short of acceptable industry standards. The engineer further testified that DePuy conducted a risk analysis that violated fundamental international consensus, downplayed the risks of the ASR XL's failure, and avoided fixing problems that would have prevented the implant's failure. He testified that DePuy violated the "rules of the road" of developing medical devices.

Kransky also called witnesses knowledgeable about DePuy's business practices relating to the development and sale of the ASR XL. DePuy's worldwide vice president

5

of marketing testified about the relative importance of profit and patient safety. The leader of the marketing team that introduced the ASR XL into the United States testified about what and when the marketing team knew about the release of metal ions into ASR XL patients. He also testified that DePuy recalled the ASR XL because it was not meeting their "clinical requirements" and the revision rate was unacceptably high.

Kransky also introduced evidence of the ASR XL's high revision rate, and how its unique design characteristics caused a high level of wear and the release of toxic metal debris from the implant, which caused Kransky's injury. A toxic-chemicals specialist from the University of California, San Francisco testified that metal ions released by the implant were toxic and could cause tissue damage. A key engineer of the ASR XL also testified that metal ions from the ASR XL could cause tissue damage.

Craig Swenson, an orthopedic surgeon with extensive experience with the ASR XL implant, testified as an expert witness for Kransky. He showed the jury pictures from five other revision surgeries that he had performed on other patients with the ASR XL implant. He used these pictures and information about these surgeries to explain to the jury how he believed the ASR XL failed and how it showed signs of such a failure. DePuy objected to the admission of the pictures and to Dr. Swenson's testimony about his other patients, arguing that it was improper expert testimony because his opinions were anecdotal and based on his "own personal experiences" rather than clinical studies, and that Kransky had not disclosed the pictures or any details about the other patients until a few days before trial. The court allowed Dr. Swenson to testify on direct examination, but delayed cross-examination to give DePuy an opportunity to take an additional, mid-trial session of Dr. Swenson's deposition and to prepare for cross-examination on the five surgeries.

Several witnesses testified about Kransky's pain, mobility difficulties, and other health problems. Kransky testified that, for years prior to his revision surgery, he experienced constant, debilitating, stabbing pain that prevented him from getting any rest. His daughter testified that he was in pain, experienced falls, became unable to walk, and required a wheelchair. Eventually, Kransky's mobility problems became so severe that

6

he was unable to shower or go to the bathroom without assistance. By the time he had the revision surgery, his primary care physician testified that Kransky was "of very little flesh, mostly bones. [He] looked ghostly in appearance, had little spontaneous movement, was virtually inanimate," and he had been like that for "quite a while."

### D. *The Verdict, Judgment, and Posttrial Motions*

The jury found DePuy strictly liable under applicable Montana law for a design defect in the ASR XL, but not for failure to warn.[2] The jury also found that DePuy had been negligent, but that DePuy's negligence did not cause Kransky's injury. The jury awarded Kransky over $8.3 million in compensatory damages, consisting of $338,136.12 in economic damages and $8 million in past noneconomic damages. The jury did not find DePuy liable for punitive damages.

DePuy filed motions for judgment notwithstanding the verdict and for a new trial, arguing, among other things, that there was insufficient evidence to support the jury's verdict, the jury's verdict was "fatally inconsistent," the court's exclusion of the FDA evidence and admission of the testimony of Drs. Trotsky and Swenson was prejudicial error, and the noneconomic damages award for pain and suffering was excessive. The court denied DePuy's posttrial motions. DePuy appealed, raising the same issues.

---

[2] Kransky lived in Montana and had his implant surgery in Montana. The trial court determined that Montana had the strongest interest in having its products liability law applied, in order to protect "people who are in Montana, and buy . . . goods [in Montana]." Neither party argues on appeal that the court erred by applying Montana law.

7

## DISCUSSION

A.   *The Trial Court Did Not Abuse Its Discretion by Excluding Evidence of the FDA's Clearance of the Implant for Sale in the United States*

DePuy argues that the trial court erred in excluding regulatory evidence of the FDA's clearance of the implant for sale in the United States and of DePuy's subsequent interactions with the FDA regarding the implant's failure rate and the voluntary recall. The trial court ruled that this evidence had only "marginal probative value" to a Montana products liability claim, and that explaining the evidence to the jury would take "an inordinate amount of time." (See Evid. Code, § 352, subd. (a) ["[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time"].)

In exercising its discretion under Evidence Code section 352, the trial court first determines whether the evidence is probative to a Montana products liability claim. "'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Montana's definition of relevance is nearly identical: "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Montana Rules of Evidence, rule 401.)[3] "[T]he forum applies its own local law in determining the grounds for excluding evidence. On the other hand, whether a particular piece of evidence is relevant will be determined in the light of what are the issues to be decided under the otherwise applicable law." (Rest.2d Conf. of Laws, § 138, com. b; see *Discover Bank v. Superior Court* (2005) 36 Cal.4th 148, 173-174 [California's choice-of-law-provisions follow the analytical

---

[3]   At oral argument, counsel for DePuy conceded that the probative value of the FDA evidence is an issue of Montana law, arguing that "[t]he question of whether the evidence goes to a substantive issue has to be decided under Montana law."

approach of the Restatement Second of Conflict of Laws], disapproved of on another ground by *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 352; see, e.g., *Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 462 [following "California decisions and the Restatement Second of Conflict of Laws"]; *Nobel Farms, Inc. v. Pasero* (2003) 106 Cal.App.4th 654, 659 [following the Restatement Second of Conflict of Laws].)

The court's evidentiary ruling balancing the probative value of the evidence against the time it would take to present the evidence is a question of California law (see Rest.2d Conf. of Laws, § 138), which we review for abuse of discretion. (See *Green v. County of Riverside* (2015) 238 Cal.App.4th 1363, 1369 ["[a] decision to admit or exclude evidence under Evidence Code section 352 is a matter committed to the discretion of the trial court"]; accord, *Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 44.) We will not disturb a trial court's exercise of discretion to admit or exclude evidence under Evidence Code section 352 """"except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.""" (*Uspenskaya v. Meline* (2015) 241 Cal.App.4th 996, 1000-1001; see *Donlen v. Ford Motor Co.* (2013) 217 Cal.App.4th 138, 150 ["'[t]rial courts enjoy "'broad discretion'" in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value'"].)

Evidence of FDA clearance, or compliance with FDA post-marketing safety regulations, is either not relevant, or minimally relevant, to a Montana strict products liability claim. "Under Montana law, a manufacturer's compliance with product safety regulations is irrelevant and inadmissible on the question of the product's defectiveness . . . ." (*Speaks v. Mazda Motor Corp.* (D. Mont. 2015) 118 F.Supp.3d 1212, 1225; see *Malcolm v. Evenflo Co., Inc.* (Mont. 2009) 217 P.3d 514, 521-522 ["declin[ing] to adopt the *Restatement (Third) of Torts: Products Liability*, § 4," which "provides that compliance with an applicable regulation is admissible in connection with liability for defective design"].) For example, in *Lutz v. National Crane Corp.* (Mont. 1994) 884 P.2d 455, the trial court in a products liability case had granted the plaintiff's

9

motion in limine "to exclude any reference to or testimony about OSHA [the Occupational Safety and Health Act] or ANSI [the American National Standard Institute]," which had promulgated certain safety standards applicable to an allegedly defective crane. (*Id.* at p. 464.) The Montana Supreme Court held that the trial court "was correct in excluding evidence of OSHA and ANSI standards," and that, "[e]ven if OSHA and ANSI regulations have some tenuous relevancy in products liability cases such as this, it is not reversible error to exclude them." (*Id.* at p. 465.) The Montana Supreme Court explained that the fact that OSHA and ANSI did not require the use of a particular safety device was not relevant "to issues . . . dispositive in design defect cases." (*Ibid.*)[4]

The trial court here similarly reasoned that evidence of the FDA's clearance of the implant was not relevant to, or had little probative value in, a Montana products liability design defect claim, characterizing the FDA evidence as "of marginal relevance," "of moderate, if any, relevance," and "irrelevant." Because evidence that a product meets certain agency standards is not relevant to the issue whether that product is defective under Montana law, the trial court correctly determined that the FDA evidence had little or no probative value in this case.

On the other side of the balancing under Evidence Code section 352, the presentation of the FDA evidence would have been expansive, complicated, and time-consuming. Under the Medical Device Amendments of 1976 to the Food, Drug and

---

[4]     Without citing any Montana cases (or any cases applying Montana law), DePuy urges us to look to California law to determine whether FDA evidence is relevant to a strict products liability claim, because, according to DePuy, "California law governs the admissibility of evidence in this case." The trial court, however, was not evaluating the probative value of the evidence in a California strict products liability action. And, just as the Montana Supreme Court declined to adopt the Restatement's view on the admissibility of compliance with product safety regulations, there is no reason to believe it would adopt California's view of the probative value of regulatory evidence in a strict products liability action. Moreover, as noted, DePuy conceded that Montana law applies to the issue of the probative value of the FDA evidence.

10

Cosmetic Act, there are two ways medical device manufacturers like DePuy can obtain clearance or approval from the FDA for a product. First, there is the PMA approval process. (21 U.S.C. § 360c(a)(1)(C)(ii).) This process "is a rigorous one. Manufacturers must submit detailed information regarding the safety and efficacy of their devices, which the FDA then reviews, spending an average of 1,200 hours on each submission." (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 477.) Second, there is an abbreviated process under section 510(k) of the Food, Drug, and Cosmetic Act, which allows manufacturers to secure FDA clearance by showing that a device is "substantially equivalent" to a device already on the market. Section 510(k) is "'focused on equivalence, not safety.'" (*Riegel v. Medtronic, Inc.* (2008) 552 U.S. 312, 323.) The FDA clearance of the ASR XL implant was under the abbreviated section 510(k) review process, not the more rigorous PMA process.[5]

In exercising its discretion under Evidence Code section 352, the trial court was justifiably concerned that explaining the meaning and significance of 510(k) clearance, as opposed to PMA approval, "would require a full description of the difference between the [two processes] and [would] take an extensive amount of time." As Kransky pointed out in his motion in limine, "[t]he time it would take to present evidence of the FDA's 510(k) clearance process, the documents and information submitted by [DePuy] during that process, the documents and information that [DePuy] did not submit to the FDA, the difference between 510(k) clearance and pre-market approval, and the cross-examination of the associated witnesses[ ] would . . . be unduly time-consuming." And, had the trial court allowed DePuy to introduce this evidence, Kransky would have been entitled to

---

[5]     Although the record is not entirely clear, it appears DePuy claimed that the ASR XL was substantially similar to three other implant devices (the DePuy Pinnacle Metal-on-Metal Acetabular Cup Line; the Wright Medical Metal TRANSCEND Articulation System; and the DePuy Ultima Unipolar Head and Adapter Sleeves), all of which were also cleared under the 510(k) process (in 2000, 2002, and 1997 respectively). The FDA apparently determined that the ASR XL was substantially similar to the DePuy Pinnacle Metal-on-Metal Acetabular Cup Line and a fourth product, the Biomet Ma System.

argue that the FDA's 510(k) review of the ASR XL did not focus on the unique design characteristics of the implant that he claimed caused his injury. Kransky also would have been able to present evidence criticizing the 510(k) process in general, the 510(k) review of the ASR XL in particular, and the nature and sufficiency of the FDA's regulatory scheme to approve new medical devices. Both sides would have called expert and percipient witnesses to testify about the two kinds of clearances and the details of DePuy's section 510(k) process.

In addition, to the extent DePuy would have used this evidence to argue that it complied with post-market reporting requirements and that the FDA never mandated or requested a recall, Kransky, as he argued to the trial court, would have "present[ed] evidence of all of the complaints, information and evidence that [DePuy was] obligated to provide to the FDA after the product went on the market, but failed to do so." As Kransky argues on appeal, "evidence that the FDA never mandated a recall" would have resulted in "a lengthy mini-trial over whether DePuy complied with its obligation [under 21 C.F.R. § 803.1, et seq.] to report all known adverse events to the FDA."

Thus, admitting the FDA evidence would have added long and complex evidentiary issues and arguments about the adequacy of the FDA's review processes and recall procedures to an already lengthy trial. (See *Colombo v. BRP US Inc.* (2014) 230 Cal.App.4th 1442, 1483 [trial court can exercise its discretion to exclude evidence that is marginally relevant and would lead to mini-trials on ancillary issues]; *In re C.R. Bard, Inc.* (4th Cir. 2016) 810 F.3d 913, 921 ["court did not abuse its discretion by excluding [under Federal Rules of Evidence, rule 403] evidence of 510(k) clearance" where "bringing in such evidence would result in a 'mini-trial' about (1) the strengths and weaknesses of the process and (2) whether [the defendant] had in fact made all of the disclosures it should have made during the process"]; cf. *Bowen v. Ryan* (2008) 163 Cal.App.4th 916, 926-927 [trial court abused its discretion under Evidence Code section 352 by admitting evidence that "was time-consuming and essentially led to a series of [mini-trials]" and had "great potential for prejudice, confusion, and consumption of time"].) Having correctly ruled that evidence of regulatory compliance had minimal or

no probative value in a Montana products liability action, and having properly considered the amount of trial time that would be required to explain and put in context the FDA review process and DePuy's post-market interactions with the FDA, the trial court did not abuse its discretion by excluding the FDA evidence. As the trial court found, admission of the FDA evidence "would have caused an extensive use of time without any concomitant value."[6]

B. *The Trial Court Did Not Abuse Its Discretion by Admitting the Testimony of Kransky's Treating Physician and Kransky's Expert Witness*

1. Dr. Trotsky's Testimony

DePuy argues that the trial court erred when it allowed Kransky's treating physician, Dr. Trotsky, to testify, over DePuy's objection, that he believed the implant was poisoning and killing Kransky. DePuy argues that Dr. Trotsky's testimony constituted improper expert opinion, and that it was unduly prejudicial and misleading. The trial court ruled that, as Kransky's treating physician, Dr. Trotsky was "allowed to draw conclusions, and [DePuy was] allowed to cross-examine" Dr. Trotsky on those conclusions. We review this ruling for abuse of discretion. (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 ["[e]xcept to the extent the trial court bases its ruling on a conclusion of law (which we review de novo), we review its ruling excluding or admitting expert testimony for abuse of discretion"];

---

[6] Pursuant to the trial court's previous invitation to raise the issue of the admissibility of the FDA evidence again if Kransky "opened the door" by suggesting DePuy did not follow FDA procedures, DePuy filed a motion for reconsideration after Kransky introduced testimony that DePuy "did not follow 'the rules of the road for making a safe medical device.'" The court denied the motion for reconsideration. DePuy does not argue that the trial court abused its discretion in denying the motion for reconsideration.

13

*Whitney v. Montegut* (2014) 222 Cal.App.4th 906, 918 [reviewing for abuse of discretion whether a doctor was qualified to render a particular opinion].)

Dr. Trotsky testified that, when he treated Kransky before the revision surgery, he believed the implant was "destroying" Kransky's health. He stated that, given his familiarity with all of Kransky's "underlying medical conditions and . . . the natural history of those conditions, that there still appeared to be another factor that was killing Mr. Kransky that was not explainable by any . . . combination of the other chronic disorders that he suffers from." Dr. Trotsky testified that the basis of his opinion that toxicity from the hip was causing Kransky's weight loss, decreased energy level, and loss of appetite was that he "was the physician who . . . was privy to the entire perspective of [Kransky's] chronic illnesses," and he had been "unable to identify any other factor" as the cause. Dr. Trotsky testified that he was "convinced that [Kransky] would die from toxicity if the hip wasn't removed." He stated, "We're talking about an individual who was moribund, on the verge of death, basically, who [after the revision surgery] again developed signs of health."

According to DePuy, Dr. Trotsky did not have sufficient "special knowledge, skill, experience, training, or education" (Evid. Code, § 720, subd. (a)) to testify that the implant was poisoning Kransky and that Kransky would die without a revision surgery. DePuy also argues that Dr. Trotsky's testimony about the implant's toxicological effects lacked foundation because Dr. Trotsky was not a toxicologist.

Dr. Trotsky's opinion that the implant was the cause of Kransky's poor health, and that the implant was poisoning and killing Kransky, was admissible. "A treating physician is a percipient expert, but that does not mean that his testimony is limited only to personal observations. Rather, like any other expert, he may provide both fact and opinion testimony." (*Schreiber v. Estate of Kiser* (1999) 22 Cal.4th 31, 35; see *Easterby v. Clark* (2009) 171 Cal.App.4th 772, 782 ["a treating physician may provide both fact and opinion testimony, including testimony on the cause of a patient's injuries"].) A treating physician "may testify as to any opinions formed on the basis of facts independently acquired and informed by his training, skill, and experience," which may

14

"include opinions regarding causation and standard of care because such issues are inherent in a physician's work." (*Schreiber v. Estate of Kiser*, *supra*, at p. 39; accord *Ochoa v. Dorado* (2014) 228 Cal.App.4th 120, 140; *Easterby v. Clark*, *supra*, at p. 782.) Dr. Trotsky's opinion was based on facts acquired and informed by his training and skill, and his experience as Kransky's treating physician. Those facts included his ruling out other medical causes of Kransky's poor health, his understanding of Kransky's hip pain and elevated cobalt and chromium levels, and his consultations with Dr. Jeffrey Hansen, the surgeon who ultimately performed Kransky's revision surgery, and Dr. Brendan Shannon, Kransky's nephrologist. (See *Cooper v. Takeda Pharmaceuticals America, Inc.* (2015) 239 Cal.App.4th 555, 582 [describing the "'''standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated'''''].) The trial court did not abuse its discretion under Evidence Code section 720, subdivision (a), in allowing Dr. Trotsky to give this opinion.

DePuy cites *Salasguevara v. Wyeth Laboratories, Inc.* (1990) 222 Cal.App.3d 379 as an example of a case where the court found that the treating physician was "not shown to be qualified" to give his opinion on causation. *Salasguevara* is distinguishable, and actually supports Kransky. The court in that case found that a vaccine manufacturer was not entitled to summary judgment based on the deposition testimony of a treating physician. The court found that, although the treating physician "gave an opinion based upon his 'understanding[ ]' [of the vaccine,] there is no way, given the limited deposition excerpts submitted, to determine if that understanding was based upon the doctor's training, experience or skill." (*Id.* at p. 386.) The court concluded that five sentences of incomplete, noncommittal deposition testimony was not enough for summary judgment, but the court suggested that the doctor's testimony on causation would be admissible at trial if it were based on his training, experience, or skill. (See *ibid.*) Thus, to the extent *Salasguevara* is relevant at all, it supports the trial court's decision to admit Dr. Trotsky's testimony after determining that the doctor's opinion was based on his training, experience, and skill.

15

Finally, DePuy argues that the trial court should have excluded Dr. Trotsky's testimony under Evidence Code section 352 because it was more prejudicial than probative. DePuy's argument, however, assumes that Dr. Trotsky's testimony was not probative because it was inadmissible expert testimony under Evidence Code sections 720, 801, and 803. The assumption is false: As noted, Dr. Trotsky's testimony was admissible because it was based on his training, skill, and experience as a physician (Evid. Code, § 720), his opinion was based on matter on which an expert may reasonably rely (*id.*, § 801), and he had a proper basis for his opinion (*id.*, § 803). The trial court did not abuse its discretion under Evidence Code section 352 in finding that the probative value of Dr. Trotsky's testimony was not substantially outweighed by substantial danger of any undue prejudice.

### 2. Dr. Swenson's Testimony

DePuy argues that the trial court abused its discretion by allowing Dr. Swenson, Kransky's orthopedic surgery expert, to testify about his experiences with five patients on whom he had performed revision surgeries to remove the ASR XL implant. After performing 207 surgeries to implant the ASR XL, and 70 revision surgeries to remove the ASR XL, Dr. Swenson testified that he saw "trends" in his experience "taking care of this particular product." He testified that patients "start developing a local collection of [metal] ions and then [the hip] starts hurting and then they get this soft tissue mass that gets bigger and bigger and bigger and then to a varying degree it starts eating away soft tissue, muscle, bone and capsule. Their ion levels go up. We see them very frequently compared to other total hip[ replacement]s." Dr. Swenson used five case studies—information about patients on whom he had performed revision surgeries and pictures from those surgeries—to illustrate how the implant fails.

According to DePuy, the trial court should have excluded Dr. Swenson's testimony because Kransky's delay or failure to disclose information about the patients before trial caused DePuy unfair surprise at trial, and because Dr. Swenson's opinion testimony was not reliable expert opinion testimony but rather was "anecdotal accounts"

16

of patients that may not have been similar to Kransky.  Neither argument, however, points to an abuse of discretion.

### a. *DePuy was not unfairly surprised*

DePuy deposed Dr. Swenson five weeks before he testified at trial, and during his deposition Dr. Swenson stated he might want to use "some of the photographs of the problems [he had] seen with ASRs" during his testimony at trial.  Dr. Swenson explained that the pictures were in his patient files and that he had not selected them yet or shown them to counsel.  Counsel for DePuy stated, "Okay.  Obviously, we reserve our rights on that.  And to the extent that they are produced we'd like, obviously, to get copies of them."  DePuy did not receive all of the photographs until two days before Dr. Swenson's trial testimony.  According to DePuy, the pretrial disclosure "did not include any medical records for the five patients or the group [of patients] from which Dr. Swenson drew them."

DePuy asked the trial court to prohibit Dr. Swenson from testifying about his other patients or using photographs from their revision surgeries during his testimony because, due to the late or inadequate disclosure, DePuy was unable to cross-examine or challenge Dr. Swenson's testimony about the five patients.  The court delayed Dr Swenson's cross-examination to allow counsel for DePuy to take an additional session of Dr. Swenson's deposition during the trial, explaining:  "The only question I have is one of fairness. . . .  I'm just crafting what I think is the appropriate solution."  DePuy then deposed Dr. Swenson regarding the other five patients.   Before Dr. Swenson's cross-examination during the trial, the court summarized its ruling:  "Well, there was surprise. . . .  The way we cured it was to have a further deposition.  That's been completed."

The trial court's solution was appropriate and well crafted.  "[A] party's expert may not offer testimony that exceeds the scope of his deposition testimony *if* the opposing party has no notice or expectation that the expert will offer the new testimony, or *if* notice of the new testimony comes at a time when deposing the expert is

17

unreasonably difficult." (*Easterby v. Clark*, *supra*, 171 Cal.App.4th at p. 780.)  The trial court did not abuse its discretion by determining that neither of these conditions applied here.  As Kransky correctly points out, "DePuy had notice because Dr. Swenson testified in his pretrial deposition that he intended to use patient photos to illustrate his opinions [and] the trial court continued Dr. Swenson's trial testimony to permit DePuy to depose him again before cross-examination."  (See *Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 674 [where feasible, the appropriate remedy for "'"[u]nfair surprise"'" is a continuance].)  Faced with a potential problem in the middle of a long trial, the trial court solved it.

This case is very different from *Bonds v. Roy* (1999) 20 Cal.4th 140 (*Bonds*), which DePuy relies on for the proposition that "'[t]he opportunity to depose an expert during trial, particularly if the testimony relates to a central issue, often provides a wholly inadequate opportunity to understand the expert's opinion and to prepare to meet it.'" (*Id.* at p. 147.)  At the trial in *Bonds*, "during the afternoon recess of the last day of testimony, . . . trial counsel sought to expand the scope of [an expert's] testimony to include two new areas," relating to wholly undisclosed topics on which the expert had "specifically confirmed" during his deposition he would not give an opinion.  (*Id.* at p. 143.)  The Supreme Court held that, if an expert witness declaration "inaccurately describes the general substance of an expert's expected testimony," the court may exclude the testimony under former Code of Civil Procedure section 2034, which governed discovery of expert witness information.  (*Bonds*, *supra*, at pp. 140, 147.)  Dr. Swenson's deposition testimony was very different:  He stated he was going to use the photographs of other hips as illustrations of problems caused by the ASR XL.

The procedural context of *Bonds* was also very different from this case.  The court in *Bonds* relied in part on the fact that the expert in that trial "was the last defense witness, testifying in the afternoon of the last day of testimony," and the "late request afforded no practical opportunity for [the expert] to be deposed or for [the plaintiff's] own experts to rebut [the] testimony," so that "[o]n these facts, the trial court properly limited the scope of [the] testimony . . . ."  (*Bonds*, *supra*, 20 Cal.4th at p. 147.)  In

18

contrast, Dr. Swenson's testimony did not relate to a wholly undisclosed subject area (but rather served to explain one of his fully disclosed opinions), and DePuy had the opportunity to depose Dr. Swenson on the specific subject before counsel for DePuy cross-examined him.[7] This case was not a situation where "'[t]he opportunity to depose an expert during trial'" provided "'a wholly inadequate opportunity to understand the expert's opinion and to prepare to meet it.'" (*Ibid.*)

b. *Dr. Swenson's testimony was sufficiently reliable*

Dr. Swenson testified that he "selected five patients that [he] thought were representative of the problems [he] saw with ASRs," in order to illustrate those problems. He testified that these patients, like Kransky, all had mechanical problems, pain, fibrous fluid collection, or high cobalt and chromium levels after he put in the ASR XL, and that they, like Kransky, all needed revision surgery to remove the implant. DePuy argues that Dr. Swenson's opinion testimony was inadmissible because "anecdotal accounts" are unreliable and improper bases for an expert opinion on causation.

The trial court did not abuse its discretion in admitting Dr. Swenson's testimony. Dr. Swenson never testified that he based his causation opinion on those five patients alone, or even that he weighed their experiences more heavily than the experiences of the other 65 patients whose revision surgeries he had performed to remove the same implant.

---

[7] DePuy also argues that it "could not place the five patients in appropriate context" or "challenge [ ] the purported representativeness" of those patients because Dr. Swenson never produced information about his other patients with ASR XL implants. DePuy made the same argument to the trial court, but only in a motion to strike Dr. Swenson's testimony. The court did not abuse its discretion in denying DePuy's motion to strike. DePuy could (and did) cross-examine Dr. Swenson regarding the representativeness of the five patients he had chosen, and, if necessary, DePuy could have requested a further session of Dr. Swenson's deposition to ask additional questions about those other patients.

To the contrary, he based his causation opinion on his vast clinical experience, including his extensive experience with the ASR XL.[8]

Citing *Allison v. McGhan Med. Corp.* (11th Cir. 1999) 184 F.3d 1300, 1316 (*Allison*), DePuy argues that "[an] expert's reliance on case studies constitute[s] 'improper methodology.'" In *Allison*, the court held that the district court did not abuse its discretion in excluding an expert's testimony based on published case studies describing the unique experiences of particular patients whom the expert had never treated. (*Id.* at p. 1316; see *Glastetter v. Novartis Pharmaceuticals Corp.* (8th Cir. 2001) 252 F.3d 986, 989-990 ["[p]ublished case studies provide experts with limited information about select individuals"].) In contrast, Dr. Swenson selected what he considered representative cases from the 70 patients whose ASR XL revision surgeries he had performed. As the treating physician, he was privy to far more information than would appear in a published case study. In addition, the reason that the trial court in *Allison* excluded the expert's testimony based on case studies was that there were "controlled, population-based epidemiological studies," on which the expert did not rely, which made the case studies "pale in comparison." (*Allison*, *supra*, at p. 1316.) DePuy does not contend that it presented "overwhelming contrary epidemiological evidence," or any other medical evidence, that rendered Dr. Swenson's testimony unreliable. In any event, affirming a trial court's decision to exclude certain evidence is quite different from reversing a trial court's decision to admit the evidence. (Cf. *Pannu v. Land Rover North*

---

[8] DePuy does not argue that Dr. Swenson's extensive clinical experience was an insufficient basis for his testimony. (See, e.g., *Sargon Enterprises, Inc. v. University of Southern California.*, *supra*, 55 Cal.4th at p. 772 [opinion testimony may be based on an expert's personal experience, and the trial court "must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether the opinion is based on a leap of logic or conjecture"]; *Cooper v. Takeda Pharmaceuticals America, Inc.*, *supra*, 239 Cal.App.4th at p. 561 [trial court erred in striking expert's testimony, which rested in part on his experience treating patients with the same illness as the plaintiff]; *Messick v. Novartis Pharms. Corp.* (9th Cir. 2014) 747 F.3d 1193, 1198-1199 ["there is nothing wrong with a doctor relying on extensive clinical experience" in forming an opinion regarding causation].)

*America, Inc.* (2011) 191 Cal.App.4th 1298, 1318 ["[a]n appellate court's ruling that a trial court did not abuse its discretion in admitting a certain type of evidence is not authority for the proposition that it is an abuse of discretion to exclude similar evidence in another case," emphases omitted].)

DePuy also argues that "Dr. Swenson failed to demonstrate the substantial similarity required before other incidents may be introduced as evidence of a defect or causation." DePuy contends that Dr. Swenson's methodology is indistinguishable from the methodology the court found inadequate in *Stephen v. Ford Motor Co.* (2005) 134 Cal.App.4th 1363, where an expert "had worked on about 300 Firestone tire failure cases but he based his similar accident testimony on only 10 of those cases." (*Id.* at p. 1372.) In *Stephen*, however, the expert was not a physician relying on clinical experience, but a tire engineer who had never examined the failed tires he was testifying about, and who "did not provide . . . any . . . information to show that the circumstances of the 10 tire failures were similar to the circumstances of this case." (*Id.* at pp. 1368, 1372.) In fact, the expert in *Stephen* conceded that only three of the 10 cases he relied on involved the same model tire that the plaintiff claimed was defective. (*Id.* at p. 1372.) For these reasons, the court concluded that the expert's "opinions and conclusions were nothing more than speculation." (*Id.* at p. 1373.)

In contrast, Dr. Swenson based his testimony on more than just the five patients to which DePuy objects. And he testified that each of the five "representative" patients had the same implant as Kransky's and experienced the same failure pattern he saw repeatedly with this implant. Dr. Swenson had performed 5,000 to 6,000 hip replacements, 207 of which were ASR XL implants, and 800 to 1,000 revision surgeries, 70 of which were ASR XL implants. Under these circumstances, it was not an abuse of discretion for the court to allow him to testify based on his clinical experience about representative patients who had experienced similar problems with the same implant to illustrate the problems with the implant.

21

C.     *Substantial Evidence Supports the Jury's Finding That the Implant's Design Defect Caused Kransky's Injury*

DePuy argues that there was no substantial evidence that a design defect in the ASR XL was the cause of Kransky's injuries. DePuy asserts that the evidence pointed to other potential causes of Kransky's injuries, such as infection and the angle at which the surgeon originally implanted the device.

"It is axiomatic that when . . . an appellant challenges the sufficiency of the evidence to support a jury's verdict, we apply the substantial evidence standard of review." (*Colombo v. BRP US Inc.* (2014) 230 Cal.App.4th 1442, 1451.) "'"Evidence is substantial if any reasonable trier of fact could have considered it reasonable, credible, and of solid value."'" (*Carolina Casualty Ins. Co. v. L.M. Ross Law Group, LLP* (2012) 212 Cal.App.4th 1181, 1189, fn. 4.) "An appellate court does not reweigh the evidence or evaluate the credibility of witnesses, but rather defers to the trier of fact." (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957-958). "Expert opinion testimony constitutes substantial evidence only if based on conclusions or assumptions supported by evidence in the record. Opinion testimony which is conjectural or speculative 'cannot rise to the dignity of substantial evidence.'" (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651; see *Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962, 972, fn. 2.) "'The ultimate determination is whether a reasonable trier of fact could have found for the respondent based on the *whole* record.'" (*Vita Planning and Landscape Architecture, Inc. v. HKS Architects, Inc.* (2015) 240 Cal.App.4th 763, 772.)

The court gave a jury instruction that tracked Montana's pattern jury instructions: "DePuy Orthopaedics' conduct is a cause of the injury if it helped produce it and if the injury would not have occurred without it." (See Montana Pattern Jury Instruction 2d No. 2.07 (2003).) Substantial evidence supports the jury's determination that the implant's design helped produce Kransky's injury and the injury would not have occurred without it.

Dr. John Dennis Bobyn, a professor and researcher in the field of artificial joint replacement at McGill University, testified that certain design features unique to the ASR XL caused increased wear. Dr. Bobyn examined Kransky's "explant" (the implant after Kransky's surgeon removed it from his hip) and testified that it was defective. Dr. Bobyn concluded Kransky's hip implant had worn excessively, "far beyond historical norms, far beyond expectations," which caused the implant to generate excessive amounts of cobalt and chromium. (See *Brandenburger v. Toyota Motor Sales, U.S.A.* (1973) 162 Mont. 506, 518 ["'[t]he most convincing evidence is an expert's pinpointing the defect and giving his opinion on the precise cause of the accident after a thorough inspection'"].) Robert Harrison, a toxic chemicals specialist who had treated patients with high cobalt and chromium levels from the ASR XL implant, testified that metal debris from a metal-on-metal hip implant like Kransky's implant causes "destruction, inflammation, . . . pain and disability." He stated that cobalt and chromium "are most certainly poisonous" and "toxic," and that "when they get out into the blood, [they] can cause really severe local tissue damage around hips." Dr. Harrison testified that, from a toxicological perspective, Kransky's hip implant had to be removed, in part because of the local tissue damage from his high cobalt and chromium levels. According to Dr. Harrison, the "blackish hole [or] blackish discoloration" visible in a photograph of Kransky's revision surgery is "a very common or classic metallosis-type picture that surgeons see at the time they go in with failed metal-on-metal hips." He testified that "Mr. Kransky's hip failed as a result of a toxin. His hip did not fail as a result of infection." He based this conclusion on several factors, including Kransky's white blood cell count, sedimentation rate, temperature readings, and toxic exposure.[9]

---

[9] Writings by DePuy officials confirmed that the company recognized the ASR XL was defective and was causing health problems. Raphael Pascaud, a DePuy vice president, sent an email in 2009 saying that "[t]he issue seen with ASR and XL [*sic*] today, over 5 years post-launch, are most likely linked to the inherent design of the product, and that is something we should recognise." Graham Isaac, the development

Dr. Swenson testified that the popping and grinding Kransky experienced was not consistent with infection. Instead, he believed that "clicking and popping is [caused by] the surfaces [of the implant] rubbing together or sliding together or sliding in and out on each other." He also testified that "black material," like the material found during Kransky's revision surgery, is "unique to metal debris." And Dr. Hansen, Kransky's surgeon, testified that he did not observe any sign of infection during the surgery. Instead, he explained that "all that black stuff [he found] inside [Kransky's] wound" could not have been caused by infection: "That doesn't happen. There is only one way you can get that black stuff in the wound, and that's by metal ions staining the tissues." Dr. Swenson also testified that "[t]he angle itself did not cause the implant to fail," and that the implant failed "independent of the angle."[10]

In the face of what the trial court called "strong evidence in support of plaintiff's claim," DePuy argues that Montana's causation standard required Kransky to rule out with certainty all possible alternative causes of injury. According to DePuy, Montana

---

manager for the ASR XL, sent an email comparing the ASR XL to a competing implant and concluding the ASR XL was susceptible to "extreme metal ion levels."

[10] It is undisputed that Kransky's implant was inserted at a relatively high angle and that hip implants in general, including non-defective implants and non-metal ones, wear at greater rates when implanted at higher angles. The parties agree that the "recommended" angle of implementation is approximately 45 degrees. According to Dr. Bobyn, 45 degrees is "commonly recognized as the mean or average inclination of the human acetabulum, or the human pelvis, the socket part of the hip joint. That doesn't mean that everybody's pelvis or acetabulum is tilted at 45 degrees. There's a relatively wide anatomical range." Dr. Swenson testified that Kransky's surgeon inserted the implant at an angle of between 55 and 58 degrees. Multiple witnesses testified that surgeons often insert implants at high angles, and that a patient's anatomical distinctions, rather than a surgeon's skill, primarily determines the angle at which implants are inserted. There was no evidence that inserting a hip implant at a high angle was misuse of the product or malpractice by a surgeon, and DePuy admitted in its interrogatory responses that it was not contending that the surgeon who implanted Kransky's ASR XL failed to follow warnings or instructions, or acted negligently when inserting the hip implant at a high angle.

law required Kransky to eliminate both infection and the angle of implantation as possible causes of his injury, which DePuy says Kransky failed to do. The issue, however, is whether substantial evidence supports the jury's findings under Montana law as instructed by the trial court. "The jury's responsibility is to decide factual issues and return a verdict in accordance with the law as instructed by the court. [Citation.] Absent instructional error . . . , for an appellate court to review a verdict under a rule of law on which the jury was not instructed would allow reversal of a judgment on a jury verdict, requiring a retrial, even though neither the jury nor the court committed error." (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 675; see *Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1534 [we do not "measure the evidence adduced at trial against rules of law" from "codes, reports of appellate cases, etc.," but rather "the rules are properly located in the instructions given the jury"].) The court did not instruct the jury that Kransky had to eliminate all other possible causes of his injury, and DePuy does not challenge the jury instructions on appeal.

In any event, Montana law does not require a plaintiff to eliminate all possible causes. Instead, Montana law has two jury instructions on causation, one for cases where there is no claim of an intervening cause and one for cases where there is, and neither of them requires the plaintiff to disprove alternative causes. The Montana Supreme Court has held "that with the exception of those cases involving allegations of independent intervening cause or multiple causes, it is sufficient to instruct the jury, as recommended in 1989 by the Montana Supreme Court Commission on Civil Jury Instructions, that: 'The defendant's conduct is a cause of (injury/death/damage) if it helped produce it and if the (injury/death/damage) would not have occurred without it.' [Citation.] In those cases where chain of causation is an issue (e.g., where there is an allegation of an independent intervening cause), we recommend, as did the Commission in 1989, the following instruction: The defendant's conduct is a cause of the (injury/death/damage) if, in a natural and continuous sequence, it helped produce it and if the (injury/death/damage) would not have occurred without it." (*Busta v. Columbus Hosp. Corp.* (Mont. 1996)

25

916 P.2d 122, 139; accord, *Fisher v. Swift Transp. Co., Inc.* (Mont. 2008) 181 P.3d 601, 611; *Jackson v. State* (Mont. 1998) 956 P.2d 35, 52.)[11]

The cases cited by DePuy do not hold otherwise. The courts in *Ankeny v. Grunstead* (Mont. 1976) 551 P.2d 1027 and *Wilson v. Northland Greyhound Lines, Inc.* (D. Mont. 1958) 166 F. Supp. 667 held only that, in those cases, there was no credible evidence to support the plaintiff's causation theory. (*Ankeny*, at p. 135; *Wilson*, at p. 675.) In *Hagen v. Dow Chemical Co.* (Mont. 1993) 863 P.2d 413 the plaintiffs alleged that the defendant's weed killer got into the water at the plaintiffs' fish farm and killed "over 8000 pounds of fish." (*Id.* at pp. 414, 415.) The defendant argued that there was insufficient evidence to conclude the defendant's weed killer killed the plaintiffs' fish because the plaintiffs' expert witness "could only speculate on the issue of causation." (*Id.* at p. 416.) Reversing summary judgment for the defendant, the Montana Supreme Court held that circumstantial evidence such as fish autopsies, witness testimony from the caretaker of the fish tank, and the presence of toxins in the fish water gave rise to factual disputes that were for a jury to resolve. (*Id.* at pp. 414-415, 417.) The Montana Supreme Court held in *Hagen*, as here, it was for the jury to resolve the conflicting evidence on causation. And, in *Wise v. Ford Motor Co.* (Mont. 1992) 943 P.2d 1310, cited by DePuy for the first time in its reply brief, the Montana Supreme Court concluded that "substantial evidence existed to support the jury verdict in favor of [the defendant]." (*Id.* at p. 1314.) The court stated that, because "[a]lternative causes were . . . not necessarily eliminated," "the jury *could have found* that [the plaintiff] did not meet his burden of proof." (*Ibid.*, italics added.) DePuy's parenthetical description of *Wise* as standing for the proposition that "a products liability plaintiff relying on circumstantial evidence to prove causation must eliminate alternative causes" is not an accurate description of the court's holding.

---

[11] DePuy does not argue that, because it claimed there were other causes of Kransky's injury, the trial court should have included the language "in a natural and continuous sequence" in the jury instruction on causation.

D.    *The Jury's Verdict Is Not Inconsistent*

"A special verdict is inconsistent if there is no possibility of reconciling its findings with each other." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357.) "'If any conclusions could be drawn . . . which would explain the apparent conflict, the jury will be deemed to have drawn them.'" (*Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 716; see *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424.) On the other hand, "[w]here the jury's findings are so inconsistent that they are incapable of being reconciled and it is impossible to tell how a material issue is determined, the decision is 'against law' within the meaning of Code of Civil Procedure section 657." (*Oxford v. Foster Wheeler LLC, supra*, 177 Cal.App.4th at p. 716.) We review alleged inconsistencies in the jury's special verdict de novo. (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092.)

DePuy argues that the jury's verdict is irreconcilably inconsistent in two ways. "First, the jury's finding that the ASR XL was defectively designed because it was 'dangerous to an extent beyond that anticipated by . . . the treating physicians' . . . directly conflicted with its finding that DePuy 'adequately warn[ed] treating physicians of those dangers which would not be readily recognized by them.'" Second, "the jury's finding that design defects for which DePuy was strictly liable caused plaintiff's injuries conflicted with its finding that plaintiff's negligence did *not* cause plaintiff's injuries." According to DePuy, "[b]oth of these irreconcilable conflicts require a new trial." We find no fatal inconsistency in the jury's verdict.

1.    There Is No Inconsistency Between the Jury's Findings of Strict Liability for Design Defect and No Liability for Failure To Warn

DePuy argues that the jury's finding DePuy had defectively designed the implant, which required the jury to find that the implant was "dangerous to an extent beyond that anticipated by . . . the treating physicians," is inconsistent with the jury's finding that DePuy adequately warned the treating physicians of the dangers that would not be readily

27

recognizable to the physicians. In other words, DePuy argues that the implant could not have been dangerous beyond what physicians anticipated if DePuy had adequately warned the physicians. This argument relies on the assumption that "adequate warning" includes warning of all dangers known and unknown to DePuy. The two findings are not inconsistent if "adequate warning" means warning of known dangers.

The trial court did not instruct the jury on the meaning of the phrase "adequately warn." There is no indication in the record that either Kransky or DePuy asked the court to give such an instruction. DePuy argues on appeal that, because the jury instructions, which as noted DePuy does not challenge, "did not limit the duty [to warn] to dangers of which DePuy was aware," the jury necessarily interpreted the duty to warn to include risks of which DePuy was *not* aware. Citing Random House Webster's Unabridged Dictionary 24 (2d ed. 2001), DePuy argues that the only possible "plain meaning" of the word "adequately" is "fully sufficient," which, according to DePuy, is not limited to "known or knowable risks." In most jurisdictions, however, a legally adequate or sufficient warning is a warning of known dangers. (See Annot., Strict Products Liability: Liability for Failure To Warn as Dependent on Defendant's Knowledge of Danger (1984) 33 A.L.R.4th 368 [collecting cases].) In California, "knowledge, actual or constructive, is a requisite for strict liability for failure to warn." (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1000; see *Livingston v. Marie Callenders, Inc.* (1999) 72 Cal.App.4th 830, 835-837; see also CACI No. 1205 [potential risks that give rise to strict liability for failure to warn must have been "known or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community at the time of manufacture/distribution/sale"].) DePuy essentially argues for a meaning of "adequate" that contravenes the law in most jurisdictions.[12]

---

[12] DePuy argues that "adequate" should not be limited to "known or knowable" risks because such an interpretation would be contrary to Montana law, which, following a minority view, does not require actual or constructive knowledge for failure to warn liability. (See *Sternhagen v. Dow Co.* (Mont. 1997) 935 P.2d 1139, 1143, 1147.) In

As the trial court recognized when ruling on DePuy's posttrial motions, "it was quite rational for the jury to find that [DePuy] had not breached its duty to warn, when there were inquires and information still coming in [to DePuy] at the time of the plaintiff's surgery,"[13] while also finding DePuy strictly liable for a design defect in the implant. The court noted that there was clear evidence of "ongoing revelations, both foreign and domestic, about problems with the ASR, and many of those revelations came after, not before, [Kransky's] implant surgery." Because there is a possibility of reconciling the jury's findings, there is no irreconcilable conflict between the jury's findings of strict liability for design defect and no liability for failure to warn.

2.    There Is No Inconsistency Between the Jury's Causation Findings

DePuy also argues that the jury's findings on the causation elements of Kransky's design defect and negligence claims are irreconcilable. DePuy argues: "The jury could not logically find that the ASR's alleged design defects caused [Kransky's] injuries on the strict liability claim but did not cause his injuries on the negligence claim."

The jury found that the implant's defective design caused Kransky's injury. The jury also found that DePuy "fail[ed] to act as a reasonable medical device manufacturer in the design or warnings of the ASR XL," but that DePuy's negligence did not cause Kransky's injury. The court instructed the jury that DePuy was strictly liable for an injury caused by a defective product even if DePuy "exercised all possible care" and even

_____

other words, DePuy argues that, had the court properly instructed the jury on Montana law, the jury would have found DePuy liable for failure to warn despite having no knowledge of the implant's defect. DePuy, understandably, did not ask for such an instruction. In any event, as noted and as DePuy conceded at oral argument, we consider only the instructions the trial court actually gave.

13    The court noted "parenthetically" that the jury's determination that DePuy did not know about the defects in the implant at the time of Kransky's surgery "might also explain the jury's decision not to impose punitive damages."

29

if the product was "faultlessly manufactured," but that DePuy was liable for negligence only if Kransky's injury was caused by DePuy's "failure to use reasonable care."

The jury's causation findings were not irreconcilably inconsistent. Under the court's instructions, the jury could have found that DePuy was negligent when it designed the implant; a defect in the implant caused an injury to Kransky; but the particular defect that caused Kransky's injury was not the result of DePuy's negligence.[14] For example, the jury could have found DePuy was negligent in designing the implant by not having a toxicologist on the design team, but Kransky did not prove that, had there been a toxicologist on the design team, the product would not have come to market in a defective state. In other words, the jury could have found the defect that made the ASR XL susceptible to extreme metal ion levels caused Kransky's injury, but that DePuy's negligence did not cause the defect. Or, the jury could have found that DePuy was negligent, but that its negligence caused a defect different from the defect that injured Kransky. For example, the jury could have believed Dr. Bobyn's testimony that DePuy should have tested (and therefore was negligent in not testing) the implant for the likelihood of "bone ingrowth fixation," a condition Kransky never alleged that he had, but that in other patients can cause the implant to loosen to the point that revision surgery is required. The jury's verdict is consistent under either of these scenarios: negligence that did not necessarily cause the defect, or negligence that caused a different defect from the one that injured Kransky.

Without citing to the record, DePuy argues that "the jury . . . was not instructed on any theory, such as negligent testing, that could permit a negligence finding based on

---

[14]    The verdict did not distinguish between negligent design and negligent failure to warn, but instead combined the two claims under "negligence." Unlike California law, which has separate approved jury instructions for negligent design (CACI No. 1220) and negligent failure to warn (CACI No. 1222), the Montana jury instructions given in this case did not separate negligent design and negligent failure to warn into distinct causes of action.

premarket conduct alone. Rather, plaintiff's negligent design theory allowed a negligence verdict *only* if the ASR XL was, in fact, defective . . . ."[15] The jury instructions, however, permitted the jury to find that DePuy was negligent based on DePuy's "design of the ASR hip implant." Therefore, it was possible for the jury to find that (1) DePuy was negligent because it failed to use ordinary care in the design of the implant by not having a toxicologist on the design team, by not following industry standards when testing the implant, or by choosing a design-team leader who had never worked on a hip implant before; (2) the implant was more dangerous than Kransky's physicians had anticipated and therefore was defective; and yet (3) the implant's defect that injured Kransky was not caused by DePuy's negligence. Because there are reasonable, consistent ways to understand and harmonize the jury's causation findings, the verdict is not inconsistent.

### E.    *The Damages Award Is Not Excessive*

DePuy argues that "[a] new trial on damages or, in the alternative, remittitur, is required" because "[b]oth the size of the [$8 million] award and the circumstances under

---

[15]    To support its statement that "plaintiff's negligent design theory allowed a negligence verdict *only* if the ASR XL was, in fact, defective," DePuy cites a case, *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 480, that does not say what DePuy says it says and is from the wrong jurisdiction (i.e., California rather than Montana). In *Merrill v. Navegar, Inc.*, the California Supreme Court held that where a defendant is liable for the negligent design of a product, that product is necessarily defective. (*Id.* at p. 480.) Thus, it is true that liability under a theory of negligent design requires an injury-causing defect. (See *Lambert v. General Motors* (1998) 67 Cal.App.4th 1179, 1184 [if a product is not defective, there can be no liability for negligent design]; *Halvorson v. American Hoist & Derrick Co.* (Minn. 1976) 240 N.W.2d 303, 307 [same].) It does not follow, however, that an injury-causing defect is sufficient for negligent-design liability, because, as the court instructed the jury in this case, for negligent-design liability the defendant's negligence must have caused (a defect that caused) the injury. In any event, the jury was not instructed that it could only find DePuy was negligent, and that the implant was defective, if it also determined that DePuy's negligence caused Kransky's injury.

31

which it was rendered compel the conclusion that it was excessive as a matter of law." We do not find the damages award excessive.

Under Montana law, "unless it appears that the amount awarded is so grossly out of proportion as to shock the conscience, a court cannot substitute its judgment for that of a jury." (*Gibson v. Western Fire Ins. Co.* (Mont. 1984) 682 P.2d 725, 738.) "'It is not a question of the amount this Court would have awarded under the circumstances. It is not the amount which in our opinion would compensate the injured party; rather, it is a question of what amount of damages will the record in the case support when viewed, as it must be, in the light most favorable to the plaintiff . . . .'" (*French v. Ralph E. Moore, Inc.* (Mont. 1983) 661 P.2d 844, 849 (*French*).)

Although we apply Montana substantive law to the question of whether the damages award is excessive, we apply California's standard of review. (See *Schlessinger v. Holland America, N.V.* (2004) 120 Cal.App.4th 552, 558, fn. 3 ["rules defining the standard of appellate review are, in general, procedural not substantive," and "'the law of the state controls on matters of practice and procedure'"].) "The amount of damages is a fact question, committed first to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial." (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078; see Code Civ. Proc., § 662.5, subd. (a).) "[A]lthough the trial court's determination is not binding upon a reviewing court, it is to be accorded great weight because having been present at the trial the trial judge was necessarily more familiar with the evidence." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 64; cf. *Maurer v. Clausen Distrib. Co.* (Mont. 1996) 912 P.2d 195, 198 ["[t]his Court will not disturb a district court's decision to grant or deny a new trial absent a manifest abuse of discretion"].)

The trial court did not abuse its discretion in ruling that the $8 million verdict "does not shock the conscience" or "appear driven by passion or prejudice." The jury heard evidence of Kransky's severe pain, his loss of mobility, and his sincere and realistic fear of dying during the revision surgery. Kransky testified that, for years before his revision surgery, he experienced constant, debilitating, stabbing pain that prevented him

from getting any rest. His "other illnesses would come and go," but "[t]he hip [pain] was always there," and there was "no way" to "get rid of any of the pain." For approximately five years Kransky could barely walk. He could not engage in the daily activities he had enjoyed before the implant surgery, like "keep[ing] [his] own yard up and mow[ing] it." Kransky testified, "I would fall and I couldn't trust myself to go out and mow the lawn." He could no longer play with his grandchildren or attend their athletic events. For nine months Kransky was confined to a wheelchair. He testified, "[E]very time I'd look at the wheelchair, I'd get disgusted because I was kind of strapped to it. I couldn't go anywhere or do anything without it." At one point Kransky's mobility problems prevented him from showering or going to the bathroom on his own. Kransky testified, "Well, my daughters are nurses, so they would help me [shower and go to the bathroom]. It's very embarrassing to have your daughter have to help you do personal things like that. That went on for quite some time." The mobility problems also prevented Kransky from rehabilitating after he suffered a stroke, and from mitigating his other health problems, because he "couldn't walk, couldn't do the things [he] should do to rehab." He "never could get well because that hip was always there."

Kransky's doctor testified that he explained to Kransky, "There's a good chance you will die if the hip is replaced." Kransky felt he "had no choice" but to have a surgery that would likely kill him: "I thought, 'Well, I'm going to die either way. One way is going to be fast. The other is going to be slow.'" He was so afraid that he would die during the revision surgery that he made funeral arrangements before the surgery. By the time he had the revision surgery, Kransky "had little spontaneous movement [and] was virtually inanimate." "My relationship with my wife, my kids, my grandkids," Kransky testified, "it was all gone."

33

The cases cited by DePuy, where courts in other jurisdictions have found other awards excessive, do not compel a different result.[16] The Montana Supreme Court has held that "[a]n award of damages in one case is unique from an award of damages in another case, and we will not use the one as a measuring rod to determine whether damages in another case were excessive because influenced by passion or prejudice." (*French*, *supra*, 661 P.2d at p. 849; see *Seltzer v. Morton* (Mont. 2007) 154 P.3d 561, 588 ["one jury may legitimately render a compensatory award that is significantly different from an equally legitimate compensatory award rendered by another jury [even] upon substantially similar facts"].) The Montana Supreme Court has also explained that there is "no authority for the notion that we may meddle with a jury's compensatory verdict in one case based on the size of a compensatory verdict rendered in another case. More to the point, we have already rejected this approach." (*Seltzer v. Morton*, *supra*, at p. 588.)

DePuy asserts in its reply brief that, even if legitimate compensatory damages awards in other cases do not shed light on whether the award in this case is legitimate, we should compare the award in this case to cases where courts have found that the compensatory damages award did shock the conscience. Montana law, however, makes

---

[16] DePuy cites only one Montana case reversing an order denying a new trial on damages, *Safeco Ins. Co. v. Ellinghouse* (Mont. 1986) 725 P.2d 217, 228. In *Safeco*, the Montana Supreme Court held that an award of $200,000 to an insured for emotional distress after its insurance company had denied a claim in bad faith "substantially exceed[ed] that which the evidence could sustain," and that the $5 million punitive damages award ("20,000% above the award of $25,000 for economic damages" and "5,000% more than the $100,000 maximum of the insurance policy") was "so grossly excessive and disproportionate to the injury as to shock one's conscience." (*Id.* at pp. 226-227.) The three dissenting justices responded that it was a "sad," unprecedented day, when "four justices, robed in judicial omniscience" substituted their judgment for that of the jury. (*Id.* at p. 228, dis. opn. of Morrison, J.) DePuy cites no other case in which a Montana court, or a court applying Montana law, reversed an order denying a new trial on damages or reduced the size of a damages award. The second-closest case DePuy cites is *Maurer v. Clausen Distrib. Co.* (Mont. 1996) 912 P.2d 195, 199, where the Montana Supreme Court, reviewing an order granting a new trial on compensatory damages for abuse of discretion, affirmed that part of the trial court's order.

34

no such distinction between comparisons to awards that have been affirmed and awards that have been reversed as excessive.  Instead, "the proper measure of compensatory damages must be determined solely based on the facts of each case [citation], and juries have wide latitude in this regard."  (*Seltzer v. Morton*, *supra*, 154 P.3d at p. 588.)  Because, like the Montana Supreme Court in *French*, we "find nothing in the jury's verdict here to shock our conscience," the $8 million damages award is not excessive as a matter of law.  (*French*, *supra*, 661 P.2d at p. 849.)

## DISPOSITION

The judgment is affirmed.  Respondent is to recover her costs on appeal.

SEGAL, J.

We concur:

PERLUSS, P. J.

ZELON, J.